# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| WARREN FREDRICK COLLINS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 13-CV-597-PJC |
| CAROLYN W. COLVIN,<br>Acting Commissioner of the<br>Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Warren Fredrick Collins ("Collins"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits and supplemental security income benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be taken directly to the Tenth Circuit Court of Appeals. Collins appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Collins was 50 years old at the time of the hearing before the ALJ on February 2, 2012. (R. 35-36). He had completed two years of college. (R. 36).

Collins testified that he last worked in March 2009 as a roustabout. (R. 36). At the time of the hearing, Collins lived in his mother's house and helped to take care of her. (R. 37). Collins had been diagnosed with diabetes around 1990, and he was taking metformin and insulin at the time of the hearing. *Id.* About two-and-a-half years before the hearing, Collins began experiencing neuropathy with a burning sensation and pain in both feet when he stood. (R. 38). Collins stated that sitting down and rubbing his feet eased his neuropathy somewhat. *Id.*

In May 2000, Collins had been stabbed three times in the left elbow area, once through the left hand, and once through the right wrist. (R. 38-40). Collins had limited use of his left hand due to a severed nerve. (R. 38). He stated that his hand was numb and felt like it had needles in it. *Id.* Collins was right handed, and he used his right hand for everything. (R. 39). While he had previously been able to work as a roustabout, he did not believe he could return to that work, in part because his right hand had become increasingly numb. (R. 39-40). He said that he burned his hands frequently because he had no sense of touch. (R. 40). He stated that a doctor had previously recommended surgery on his right wrist for carpal tunnel syndrome, but Collins decided not to risk it. (R. 41). He dropped items with his right hand, and due to his lack of sensation, he had to watch closely to see if he was touching items. (R. 44). He wore a wrist brace sometimes on his left hand, but he did not pick up much with his left hand. (R. 44-45). With his right hand, he could pick up a gallon of milk. (R. 45).

Collins testified that his eye doctor had told him that he had the beginnings of glaucoma. (R. 40). While he had prescription bifocal glasses, his eye doctor had told him that he could expect some vision problems due to his age, glaucoma, and diabetes. *Id.* He experienced blurry vision which made it difficult to read or to use tools. (R. 43). Collins said that he used a magnifying glass around the house. *Id.*

Collins described his diabetes as uncontrollable, because his doctor frequently increased his medication. (R. 41-42). He said that his blood sugar levels were extremely high, 525, in the mornings, but a normal reading was 250. (R. 42). His blood sugar levels dropped below 75 about three times a month. *Id.* When his blood sugar was low, Collins felt itching on his chest, he shook, and he had trouble talking or walking. (R. 42-43). These episodes lasted for about forty-five minutes. (R. 43). When his blood sugar levels were high, it made him sleepy. (R. 43).

Collins could stand or walk for about half-an-hour before he started to experience the burning sensation in his feet, and he would need to sit down. (R. 45). He could also get the burning sensation while sitting, and he would rub his feet then to try to "get some circulation going." *Id.* Collins stumbled maybe twice a day, but he hadn't fallen. (R. 45-46). He was careful when walking on uneven surfaces. (R. 46). He wore diabetic shoes to protect his feet and to give him more stability. (R. 46-47). Collins experienced dizziness sometimes, especially when getting up out of a chair. (R. 47). He tried to watch his high blood pressure, and it was controlled as long as he took his medicine. *Id.*

Collins stated that he sometimes missed doctor's appointments because they overlapped with his mother's appointments. (R. 48). His younger brother drove because Collins did not want to risk driving due to his problems with his vision. *Id.* Collins cooked and cleaned around the house for about forty-five minutes at a time before having to rest for about ten minutes. (R. 48-49). He had trouble tying his shoes and using a zipper or buttons. (R. 49). Collins didn't leave his house at all about three times a week because of his balance or his vision. (R. 50). He woke up about twice a night because of the burning in his feet. *Id.* Collins saw streaks of light if he was late or missed taking his high blood pressure medication. *Id.*

Records from Cushing Regional Hospital in July, August, and September, 2000, indicate that Collins attended rehabilitation and occupation therapy after a left radial nerve laceration and repair. (R. 196-211). A hand evaluation form dated July 20, 2000 stated Collins' diagnosis as multiple stab wounds, especially left upper extremity; and status post explorative surgery of the left elbow with radial nerve repair. (R. 204). The form stated that Collins had two surgeries, with the last one in June 2000. *Id.* Collins was experiencing a burning pain in his left elbow, distal upper arm, and proximal forearm, exacerbated by certain movements and positions. *Id.* He was described as having minimal use of his left arm, with the ability to use it as an assist with some activities. *Id.* His grip strength in his right arm was 104 pounds and his left was 17 pounds. (R. 206). He had difficulty with buttons, zippers, and eating. *Id.*

Collins was seen as a new patient at the Perkins Family Clinic (the "Perkins Clinic") on November 3, 2008. (R. 269-71). The section of the form for past history stated that Collins had been diagnosed with type 2 diabetes in 1995. (R. 269). He had smoked one pack of cigarettes per day for 33 years. *Id.* Clinical impressions appeared to be type 2 diabetes and hypertension. (R. 270). He was advised about weight reduction, smoking cessation, diet, and exercise. *Id.* He was given referrals for an eye exam and a dental consultation. *Id.* Collins was seen at the Perkins Clinic for follow-up and medication refills on December 8, 2008. (R. 267-68). Clinical impressions apparently were type 2 diabetes; hypertension; hyperlipidemia; familial hypercholesterolemia[1]; and coronary artery disease. (R. 268). At a follow-up appointment on

---

[1] Familial hypercholesterolemia is "an inherited disorder of lipoprotein metabolism resulting from defects in the cellular receptor for plasma low-density lipoprotein (LDL)." *Dorland's Illustrated Medical Dictionary* 899 (31st ed. 2007).

4

February 10, 2009, Collins' physician noted that his diabetes was not controlled. (R. 265-66). Collins was seen again for follow-up of his diabetes on February 19, 2009. (R. 263-64).

Collins saw an optometrist on May 12, 2009, and Collins' diabetes and high blood pressure were noted. (R. 238). Collins complained of blurry near vision, and it appears that glasses were ordered. *Id.*

On June 1, 2009, Collins returned to the Perkins Clinic and complained that metformin was causing him nausea. (R. 259-60). It appears that Collins' medications were adjusted. (R. 260). Collins returned on September 18, 2009, and he had not done lab work ordered on June 1. (R. 256-57). It appears that an x-ray was ordered, along with blood tests, his medications were adjusted, and he was again counseled on diet, exercise, and medication compliance. (R. 257).

Collins returned to the Perkins' Clinic on February 17, 2010, and he complained of numb hands and feet. (R. 244-45). He said that it was hard for him to control his blood sugar levels both too high and too low. (R. 244). A hand-written note about Collins' hands and feet is not legible. *Id.* Another note appears to indicate that Collins had not been taking his full dose of medication, and his medications were adjusted. *Id.* Lab work was ordered. (R. 245). Collins returned on March 3, 2010. (R. 249-50, 273-75). Collins' physician certified that Collins had peripheral neuropathy with evidence of callus formation of his feet, along with poor circulation, and Collins was prescribed diabetic shoes. (R. 273-75). On March 19, 2010, Collins complained of numbness in his feet, and he had burned his left arm with a heating pad. (R. 246-47).

At an appointment on June 9, 2010, at the Perkins Clinic, Collins complained that his feet were numb and he experienced burning in his legs, which was worse at night. (R. 242-43). A note stated that Collins had not been checking his blood sugar levels. (R. 242). On examination, Collins had reduced sensation to touch in both feet. (R. 243). Clinical impressions were

peripheral neuropathy and type 2 diabetes. *Id.* Collins returned on July 6, 2010, to review the results of his lab work. (R. 240-41).

Collins returned to his optometrist on July 30, 2010, because of blurry near vision. (R. 236-37). His glasses were adjusted. (R. 236).

Collins returned to the Perkins Clinic on September 8, 2010. (R. 371-72). Collins returned on January 4, 2011, and wanted to have a rash on his leg examined. (R. 276). Assessments were tinea corporis and uncomplicated type 2 diabetes. *Id.*

Collins saw his optometrist again on March 22, 2011, complaining of blurry near vision. (R. 335-36). The doctor made a note about Collins' high blood sugar levels. *Id.*

Collins returned to the Perkins Clinic on June 22, June 28, and September 19, 2011, for routine follow-up appointments. (R. 282-83, 292-95). On December 19, 2011, Collins complained of his feet burning. (R. 307-08). His medications were adjusted. *Id.*

Collins returned to the Perkins Clinic on January 19, 2012 for evaluation of his diabetes. (R. 338-42). Upon examination of Collins' feet, sensation to touch was absent, posterior tibial pulses were weak but palpable, there was peeling globally, and there were small abrasions and calluses. (R. 339). It was noted that an eye exam done elsewhere had shown the beginning stages of glaucoma. *Id.*

Agency examining consultant Corey R. Babb, D.O., completed a physical examination of Collins on June 10, 2010. (R. 213-19). Collins' chief complaint was diabetes, and Dr. Babb reviewed Collins' history. (R. 213). Dr. Babb noted that Collins had reduced range of motion in his left arm due to weakness and pain. (R. 214). Dr. Babb evaluated Collins' grip strength as 2/5 on the left and 5/5 on the right. *Id.* His great toe strength was 3/5 bilaterally. *Id.* Dr. Babb's assessments were poorly controlled insulin-dependent diabetes and history of brachial nerve

injury to the left arm. *Id.* On the Range of Joint Motion Evaluation Chart and the Hand/Wrist Sheet, Dr. Babb noted the reduced range of motion of Collins' left shoulder and arm. (R. 216-17). Dr. Babb said that Collins could not effectively oppose his left thumb to his fingertips or manipulate small objects with his left hand. *Id.* He said that Collins could not effectively grasp tools such as a hammer. *Id.*

Agency examining consultant Steven G. Chrysant, M.D., completed a toe photoplethysmography[2] of Collins on June 28, 2010. (R. 222-26). Dr. Chrysant found that the segmental pressures and the ankle-brachial index of the toes of both feet were within normal limits. (R. 222).

Nonexamining agency consultant J. Marks-Snelling, D.O., completed a Physical Residual Functional Capacity Assessment on July 8, 2010. (R. 227-34). For exertional limitations, Dr. Marks-Snelling indicated that Collins could perform work at the "light" exertional level. (R. 228). For narrative explanation, Dr. Marks-Snelling briefly summarized the treating records that referred to Collins' diabetes, history of left arm injury, and high blood pressure. *Id.* Dr. Marks-Snelling summarized the reports by Dr. Babb and Dr. Chrysant. (R. 228-29). She also summarized Collins' activities of daily living. (R. 229). For manipulative limitations, Dr. Marks-Snelling said that Collins was limited in reaching, handling, and fingering. (R. 230). She referred to the nerve damage in Collins' left arm and the findings of Dr. Babb. *Id.* Dr. Marks-Snelling found no postural, visual, communicative, or environmental limitations. (R. 229-31).

---

[2] Photoplethysmography is "a technique for assessing blood flow." *Dorland's Illustrated Medical Dictionary* 1461 (31st ed. 2007).

**Procedural History**

Collins filed his applications for disability insurance benefits and supplemental security income benefits in May 2010. (R. 121-27). Collins asserted onset of disability on March 15, 2009. (R. 121). The applications were denied initially and on reconsideration. (R. 70-84). An administrative hearing was held before ALJ Richard J. Kallsnick on February 2, 2012. (R. 31-61). By decision dated March 7, 2012, the ALJ found that Collins was not disabled. (R. 17-27). On July 15, 2013, the Appeals Council denied review. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four,

8

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

**Decision of the Administrative Law Judge**

In his decision, the ALJ found that Collins met insured status requirements through June 30, 2013. (R. 19). At Step One, the ALJ found that Collins had not engaged in any substantial gainful activity since his alleged onset date of March 15, 2009. *Id.* At Step Two, the ALJ found that Collins had severe impairments of diabetes, history of brachial nerve injury to the left arm,

---

where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

and hypertension. *Id.* The ALJ found that Collins' eye problems were nonsevere. (R. 19-20). At Step Three, the ALJ found that Collins' impairments did not meet any Listing. (R. 20).

The ALJ found that Collins had the RFC to perform a range of work at the light exertional level "except he has lost the use of the left arm." (R. 20). He continued:

> He is right hand dominant and he has no limitations in the right hand. With his left hand, he is able to feel. However, fingering, handling, and reaching overhead with the left extremity, is limited. He is able to use his left arm and hand as a helper. As such, range of motion is decreased in the left upper extremity due to weakness and pain and thumb finger opposition is decreased on the left. The claimant is afflicted with symptomatology from a variety of sources of sufficient severity to be noticeable to him; but nonetheless he is able to remain attentive and responsive in a work setting and carry out work assignments satisfactorily. The claimant takes medications for relief of his symptomatology, but the appropriate use of the medications would not preclude him from remaining reasonably alert to perform required functions presented in a work setting.

(R. 20-21). At Step Four, the ALJ determined that Collins could not return to past relevant work. (R. 25). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Collins could perform, taking into account his age, education, work experience, and RFC. (R. 26). Therefore, the ALJ found that Collins was not disabled at any time from March 15, 2009, through the date of his decision. (R. 27).

**Review**

Collins asserts that the ALJ erred because his RFC determination was not supported by substantial evidence, his credibility assessment was flawed, and his Step Five finding was invalid. Plaintiff's Opening Brief, Dkt. #15. Regarding the issues raised by Collins, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. The ALJ's decision is therefore **AFFIRMED**.

**The ALJ's RFC Determination**

In this section of his brief, Collins first asserts that the ALJ was required to have an examining consultant explicitly perform a residual functional capacity assessment. Collins cites to nothing to support this argument except for authorities that speak generally to the ALJ's duty to develop. Collins' argument is in conflict with Tenth Circuit precedent that approves of the use of nonexamining consultants to provide functional assessments and that holds that the opinion evidence of a nonexamining agency consultant is substantial evidence upon which an ALJ is entitled to rely. *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Franklin v. Astrue*, 450 Fed. Appx. 782, 790 (10th Cir. 2011) (unpublished) (RFC assessment of agency nonexamining physician was substantial evidence supporting ALJ's conclusion); *Barrett v. Astrue*, 340 Fed. Appx. 481, 485 (10th Cir. 2009) (unpublished) (ALJ was entitled to rely upon opinion of nonexamining psychiatrist). Moreover, Collins' attorney did not request a second consultative examination. (R. 33-34, 60-61). When a claimant is represented by counsel, the ALJ can ordinarily rely on counsel to structure and present the claimant's case. *Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997). The undersigned finds that the ALJ was not required to order a second consultative examination of Collins.

In a related argument, Collins states that Dr. Marks-Snelling's opinions were stale because they were made in July 2010, and the ALJ's decision was given in March 2012. Plaintiff's Opening Brief, Dkt. #15, pp. 4-5. Collins overlooks that a second agency physician affirmed Dr. Marks-Snelling's opinions on March 16, 2011, and he stated that the additional evidence that had been submitted did not change those opinions. (R. 281). Additionally, as was true for Collins'

argument regarding a second consultative examination, Collins' attorney did not present an argument at the hearing that the assessments in the record were too old to be relied upon. (R. 33-34, 60-61). The opinion evidence of Dr. Marks-Snelling and the second agency consultant was substantial evidence upon which the ALJ was entitled to rely. *Flaherty*, 515 F.3d at 1071.

As an alternative argument, Collins argues that the ALJ erred by failing to adopt all of Dr. Marks-Snelling's limitations, and he specifically asserts that the ALJ failed to adopt Dr. Marks-Snelling's opinion regarding his ability to reach. Plaintiff's Opening Brief, Dkt. #15, p. 5. The difficulty here is that the ALJ's RFC was more detailed than the assessment of Dr. Marks-Snelling and could be interpreted as more favorable to Collins. Regarding Collins' ability to use his left arm, Dr. Marks-Snelling checked boxes indicating that Collins was limited in his ability to reach in all directions, including overhead, to handle, and to finger, and her narrative comments mirrored the comments of examining consultant Dr. Babb that Collins had decreased range of motion in his left arm due to weakness and pain, with decreased ability to oppose his left thumb and finger. (R. 230). The ALJ's RFC determination was not inconsistent with this, but elaborated on it considerably. (R. 20). The ALJ's inclusion of language that Collins had "lost the use of the left arm" but could "use his left arm and hand as a helper" was based on Collins' testimony at the hearing, and this language elaborated on Collins' functional abilities. (R. 39-41, 55-56, 59-60). The undersigned, therefore, finds that the ALJ, while stating Collins' ability to use his left arm in slightly different terms than those used by Dr. Marks-Snelling, was consistent with that opinion. *See, e.g., Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161-65 (10th Cir. 2012) (finding ALJ's RFC determination was not inconsistent with opinion evidence from several sources); *Harris v. Astrue*, 496 Fed. Appx. 816, 820-21 (10th Cir. 2012) (unpublished) (limitation to simple, routine tasks in ALJ's RFC determination was not inconsistent with evidence from special education teacher or

treating source). The undersigned rejects the argument that the ALJ failed to adopt any portion of the opinions of Dr. Marks-Snelling.

The ALJ's RFC determination was supported by substantial evidence and complied with legal requirements.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary*, 695 F.3d at 1167.

The undersigned disapproves of the extent to which the ALJ used boilerplate language in his credibility assessment. (R. 22, 24-25). The use of boilerplate language in Social Security disability cases has been discouraged by the Tenth Circuit because it fails to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered." *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). However, boilerplate language is "problematic only when it appears 'in the absence of a more thorough analysis.'" *Keyes–Zachary,* 695 F.3d at 1170 (quoting *Hardman*). The question here is whether there was a "more thorough analysis" that satisfied legal requirements.

The first two paragraphs included by the ALJ in his credibility assessment are boilerplate provisions relating to activities of daily living. (R. 24). The ALJ in these two boilerplate

provisions did not specify any particular activities of daily living, and these provisions are not persuasive reasons to discount Collins' credibility. Commissioner does not refer to activities of daily living in her defense of the ALJ's credibility assessment. Commissioner's Response Brief, Dkt. #16, pp. 6-7. The undersigned finds that these two paragraphs are not part of a "more thorough analysis" that would support an adverse credibility assessment.

The ALJ next included a boilerplate provision that Collins' care had been "essentially routine and conservative." (R. 24). In some contexts, the Tenth Circuit has approved of the use of this boilerplate provision. *Wall*, 561 F.3d at 1068; *Mayberry v. Astrue*, 461 Fed. Appx. 705, 711 (10th Cir. 2012) (unpublished). The ALJ said that Collins' treatment consisted of monitoring and prescription medications. (R. 24). This is one legitimate specific reason to find a claimant less than fully credible, and it was tied to substantial evidence. *Wall*, 561 F.3d at 1068.

The ALJ then gave specific instances where Collins' testimony differed from the treating evidence. First, the ALJ pointed out that, while Collins said that he had burning of his legs and feet that interfered with his ability to stand and walk, the treating records did not always reflect this complaint. (R. 24). In his earlier discussion of Collins' treatment at the Perkins Clinic, the ALJ cited specifically to the records of June through September 2011 as not including those complaints. (R. 23-24, 282-83, 292-95). The undersigned finds that this reason, by itself, would not be sufficient to support the ALJ's adverse credibility assessment. *See, e.g., Borgsmiller v. Astrue*, 499 Fed. Appx. 812, 818-19 (10th Cir. 2012) (unpublished) (decreasing frequency of flares did not provide substantial evidence that claimant's complaints of pain were not credible); *Hierstein v. Chater*, 110 F.3d 73 *2 (10th Cir. 1997) (unpublished) (criticizing ALJ's choice of two "superficially favorable" notations out of a five-year treatment record). A finding that subjective complaints are inconsistent with objective medical evidence is a legitimate reason that

14

supports an adverse credibility assessment. *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013). Therefore, while this reason was a weak one, it was another legitimate reason supporting the ALJ's credibility assessment, and it was supported by substantial evidence.

Second, the ALJ noted that while Collins said that he experienced low blood sugar levels at least three times a month, there were some specific notations in the treating records indicating that Collins did not experience hypoglycemia. (R. 24). This again is some evidence that Collins' subjective complaints were inconsistent with the objective medical evidence, thus supporting the ALJ's credibility assessment.

One last provision of the ALJ's credibility assessment related to Collins' assertion of side effects. *Id.* The undersigned finds that side effects of medications were not a major part of Collins' claim of disability. (R. 50-51). Therefore, an argument regarding whether treating records support alleged side effects is not probative. Moreover, the ALJ did not give any specific examples or citations to the record to support this boilerplate provision.

The undersigned, with some reluctance, finds that the ALJ's reasons given to support his adverse credibility assessment are "closely enough linked to the evidence to pass muster." *Keyes-Zachary*, 695 F.3d at 1172. It would have been preferable for the ALJ to have given stronger and more detailed reasons to support his adverse credibility assessment. *Keyes-Zachary*, 695 F.3d at 1166 ( "[t]he more comprehensive the ALJ's explanation [for weight given opinion evidence], the easier our task"). Here, however, the ALJ explained his reasons for finding that Collins' treatment was conservative. *See Best-Willie v. Colvin*, 514 Fed. Appx. 728, 735-36 (10th Cir. 2013) (unpublished) (approving conservative treatment as one factor supporting adverse credibility assessment); *Holbrook v. Colvin*, 521 Fed. Appx. 658, 664 (10th Cir. 2013) (unpublished) (same); *Mayberry*, 461 Fed. Appx. at 711 (same). He also gave two specific

examples when the treating records did not fully support Collins' claims regarding the symptoms he was experiencing. The undersigned finds that the ALJ's credibility assessment was sufficient and was supported by substantial evidence.

**Step Five Issues**

Collins makes several arguments related to Step Five. Plaintiff's Opening Brief, Dkt. #15, pp. 8-10. At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account her age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999). The ALJ is allowed to do this through the testimony of a vocational expert (the "VE"). *Id.* at 1089.

Collins' first argument is a reiteration in the context of the hypothetical to the VE that the ALJ failed to include the "reaching in all directions" limitation found by Dr. Marks-Snelling. *Id.* at 8. The undersigned adopts all of the previous discussion and finds that the hypothetical to the VE included limitations that were in some ways more sweeping than those found by Dr. Marks-Snelling. The ALJ's use of the phrases "lost the use of his left arm as indicated in his testimony," "reaching overhead with the left extremity [was limited]," and "he can use his left arm and left hand as a helper-hand" conveyed essentially the same information that was conveyed in Dr. Marks-Snelling's assessment, but with more detail. (R. 55-56, 230). *Keyes-Zachary*, 695 F.3d at 1161-65; *Harris*, 496 Fed. Appx. at 820-21. Thus, the hypothetical to the VE reflected with precision all of the limitations borne out by the record. *Leach v. Astrue*, 470 Fed. Appx. 701, 704 (10th Cir. 2012) (unpublished).

Collins' remaining argument at Step Five is that the VE's testimony was in conflict with the Dictionary of Occupational Titles (the "DOT"). Plaintiff's Opening Brief, Dkt. #15, pp 8-10. An ALJ must elicit testimony from a VE regarding whether the VE's testimony conflicts with the

16

DOT. *Haddock*, 196 F.3d at 1089-92. If there is a conflict, the ALJ must investigate it and elicit a reasonable explanation for the conflict before he can rely on the testimony of the VE. *Id.* at 1091-92.

Here, Collins argues that the jobs identified by the VE and relied upon by the ALJ require frequent reaching, handling, and fingering, which Collins cannot do with his left arm and hand. He therefore states that this is a conflict with the DOT. However, the ALJ inquired of the VE regarding whether there were any conflicts with the DOT, and the VE testified that there were not. (R. 58). The undersigned finds that the VE's testimony, therefore, was substantial evidence upon which the ALJ was entitled to rely. *See, e.g., Lately v. Colvin*, 560 Fed. Appx. 751, 755 (10th Cir. 2014) (unpublished) (VE's testimony that identified jobs were consistent with the DOT was substantial evidence supporting the ALJ's decision); *Thompson v. Colvin*, 551 Fed. Appx. 944, 949 (10th Cir. 2014) (unpublished) ("This court will not evaluate in the first instance whether a claimant is able to perform specific jobs," but role is limited to whether there is substantial evidence supporting decision).

At Step Five the ALJ's decision was supported by the substantial evidence provided by the VE's testimony, and therefore the Court affirms.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and complies with legal requirements. The decision is **AFFIRMED**.

Dated this 6th day of October 2014.

Paul J. Cleary
United States Magistrate Judge